IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


LEVERT LYONS,                                                    Civ. No. 09-1183-AC

                          Plaintiff,                                    OPINION AND
                                                                              ORDER

        v.

NIKE, INC.,

                          Defendant.

_____

ACOSTA, Magistrate Judge:

*Introduction*

        Defendant Nike, Inc. ("Nike") moves for summary judgment of noninfringement and

invalidity on Claims 1 and 3 of U.S. Patent 5,513,448 ("the '448 Patent") belonging to Plaintiff

Levert Lyons ("Lyons").  Lyons moves for partial summary judgment that Nike willfully infringed

the '448 Patent.  For the reasons stated, Nike's motion for summary judgment is granted as to

noninfringement and denied as to invalidity. Having granted Nike's motion regarding noninfringement as a matter of law, the court denies Lyons's motion as moot.

*Factual Background*

The '448 Patent was filed on July 1, 1994. The original application was rejected and Lyons amended it, explaining: "Claim 1 has been amended to clarify that the cassette is secured in place by a positive interlock and not a mere press fit." (Rechtien Declaration ("Decl."), Exhibit ("Ex.") C at 325-326.) The amended application was again rejected on May 15, 1995, in part because the language in Claim 1 regarding the positive interlock was vague. *Id.* at 331. Lyons again amended the patent application, stressing the importance of the "positive interlock" as an innovation. *Id.* at 343-344. The patent ultimately issued after Lyons abandoned some of the claims. *Id.* at 348.

In this case, the accused devices are Nike's Air Jordan athletic shoes, versions 21 and 22 (hereinafter referred to as "AJ21" and "AJ22" respectively). These athletic shoes include insertable foam pods as part of a feature Nike refers to as "Independent Podular Suspension." (Rechtien Decl., Ex. D (promotional material related to AJ21).) This particular technology gives rise to the present dispute.

At issue for purposes of these motions are Claims 1 and 3 of the '448 Patent.

*Legal Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2011). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

*Discussion*

I.    Infringement

Infringement analysis calls for "a two-step process: first, the claim must be interpreted, as a matter of law, to ascertain its proper scope; second, a determination must be made whether the

properly construed claim reads on the accused device." *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1582 (Fed. Cir. 1995) (citing *Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992)). The second step requires a determination as to whether, as a factual matter, the accused device is essentially identical to the patented device. Infringement may be direct or indirect: "Claims for indirect infringement cannot exist in the absence of direct infringement. In order to prevail on an indirect infringement claim, a plaintiff must first demonstrate direct infringement, then establish that the 'defendant possessed the requisite knowledge or intent to be held vicariously liable.'" *Mallinckrodt Inc. v. E-Z-EM Inc.*, 2009 U.S. Dist. LEXIS 108696, at *10 (D. Del. Nov. 20, 2009) (quoting *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004)).

Direct infringement may be literal or may arise under the doctrine of equivalents. Literal infringement occurs "when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly." *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996) (citing *Johnson v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989). A device may also infringe under the doctrine of equivalents, which was generally described by the Supreme Court: "Under this doctrine, a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21 (1997) (quoting *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 609 (1950)).

Nike argues that Lyons cannot establish literal infringement of either Claim 1 or Claim 3. With respect to Claim 1, Nike argues that the following limitations are not found in the accused

devices: "fastener assembly," "positive interlock," "flexing to disengage," and "insole removably

mountable."  With respect to Claim 3, Nike argues that the accused devices lack a cassette with

bottom and top sections locking a spring element between them and thus cannot literally infringe.

Nike also argues that Lyons may only assert claims for literal infringement as he has failed to provide

evidence to support claims for infringement under the doctrine of equivalents and cannot now do so.

Lyons does not dispute this point in his responsive briefing and the issue is thus conceded.

> *A.*    *Noninfringement of Claim 1*

Claim 1 states:

> An athletic shoe characterized by: a bottom cushioned sole; shoe upper connected to
> said bottom cushioned sole and forming with said sole an interior sized for receiving
> a human foot; an insole removably mountable in the interior of said shoe and
> normally mounted over an upper surface of said bottom sole; said bottom sole having
> a cavity that is accessible through its upper surface such that it is accessible from the
> interior of said shoe; a flexible resilient cassette mounted in said cavity; said cassette
> having an outer wall contoured to form a first portion of a fastener assembly; said
> cavity having a side wall contoured to provide a second portion of said fastener
> assembly; said cassette made from a resiliently flexible material; said cassette
> normally being positively secured in place within said cavity during normal wear and
> flexing of said shoe sole during use on a foot via said fastener assembly with first and
> second portions forming a positive interlock; said cassette being removable from said
> cavity by removal of said inner sole and flexing of said bottom sole such that its rear
> and forward ends move downwardly with respect to its center section to disengage
> said first portion from said second portion of said fastener assembly and allow
> removal of said cassette from said cavity and from said interior of said shoe.

(Rechtien Decl., Ex. 1 (the '448 Patent) at 6:14-44.)[1]

> 1.    <u>Fastener Assembly</u>

The court construed the phrase "fastener assembly" found in Claim 1 as "an assembly

comprising two portions that engage to fasten the cassette securely in the cavity." (Findings and

---

[1] The '448 Patent will hereinafter be referred in citation form as "Patent" followed by the
column:row designation of the cited material, e.g., Patent 1:2-3.

Recommendation on Claim Construction[2] (#63) at 10.)  The claim itself provides, with respect to the fastener assembly, that the cassette has "an outer wall contoured to form a first portion of a fastener assembly" and "a side wall contoured to provide a second portion of said fastener assembly[.]" (Patent 6:27-30.)  The claim provides further that the cassette is held in place "via said fastener assembly with first and second portions forming a positive interlock[.]"  (Patent 6:32-37.)

Nike argues that the accused products do not meet the limitations associated with a "fastener assembly" for three reasons.  First, flexion is not required to remove the pods from the shoe.  In fact, Nike argues, the pods are easily removable by simply pushing the pod from the exterior of the shoe.  Second, the shoe does not contain a fastener assembly; rather, the pod stays in place via a friction fit along contact points.  This is underscored, Nike argues, by the fact that "even lightly pushing in on the bottom of the shoe provides sufficient force to slide the pod out of the cavity."  (Nike's Memorandum at 11.)  Third, the pods are not contoured to securely fasten to the shoe but are instead tapered to facilitate removal.  Again, Nike contends, the fact that the pods slide out easily demonstrates that the pods are not secured inside the shoe via a fastener assembly.  Nike cites the testimony of Lyons's expert, Dr. Duane Priddy ("Dr. Priddy"), in support of its contention that the pods in the AJ21 do not require disengagement, but rather slide out easily, or even fall out.  Nike also notes Dr. Priddy testified that the only reason he concluded that the AJ21 pod was securely fastened in the shoe was that it did not fall out as the AJ22 pod did.

Lyons responds that the evidence presented raises a genuine issue of material fact that the accused devices include fastener assemblies and, thus, summary judgment is inappropriate.  Lyons

---

[2] This Findings and Recommendation was adopted by Judge King on February 11, 2011, and will hereinafter be referred to as "Claim Construction Order."

cites both the original and supplemental reports of expert witness Dr. Priddy, deposition testimony of Lyons himself, and deposition testimony of Nike's witness Joshua Heard ("Heard"), one of the designers of the accused devices.  First, Lyons refers to three photographs attached to the "Supplemental Report of Dr. Duane Priddy" (hereinafter "Priddy Supp. Report") as Exhibits A, B, and C.  These pictures show cross sections of the AJ21 shoe.  Exhibit A is a cross section of the entire shoe intended to show, generally, the various elements of the shoe.  Exhibit B purports to show the cassette cavity including a ridge and recess in the cavity that, according to Dr. Priddy's caption, "presses into the outer wall of the cassette material during use."  (Priddy Supp. Report Ex. B.)  Exhibit C shows the pod insert in the AJ21 shoe and purports to show "its contoured outside surface" and "an impression left in the outside surface of the cassette by pressure from the ridge in the cavity side wall."  (Priddy Supp. Report Ex. C.)  Nike argues that these photos fail to establish the presence of a fastener assembly because still photographs cannot demonstrate that the pod is securely fastened.

Lyons also refers to text portions of Dr. Priddy's Supplemental Report.  In discussing the presence of a positive interlock, Dr. Priddy referred to the fastener assembly created by the wall of the pod and the ridge and recess of the cavity, noting that during normal wear, the parts engaged to form a positive interlock distinct from a mere press fit.  (Priddy Supp. Report 21:10-15.)  Dr. Priddy also refers to Exhibit G which, in his estimation, depicts the fastener assembly comprised of the outer wall of the pod and the side wall of the cavity.  (Priddy Supp. Report 12:12-21.)  The report also describes how the flexible outer wall of the pod "readily deforms against and engages the contoured surface of the contoured wall of the cavity[,]" comprising the fastener assembly.  (Priddy Supp. Report 19:16-21.)  In Nike's view, these excerpts do not genuinely dispute the fact that the

pods slide out of the cavity easily, and are thus not fastened securely therein.  Nike notes that Lyons did not dispute the testimony of Dr. Priddy, its own expert, that the pod simply fell out of the AJ22 when he tipped the shoe upside down, or that he was able to easily slide the pod out of the AJ21 by pressing from the bottom of the shoe.

In his deposition testimony, Dr. Priddy identified as the first portion of the fastener assembly an indentation in the pod.  (Cowart Decl., Ex. C at 100:3-9.)  He describes the pod as being contoured in that the shape of the pod slopes around the corners of the pod, and as continuous in that no part of the outer pod wall is not contoured.  (*Id.* at 99:11-18.)  And, by his testimony, Lyons confirms that the entire portion of the pod's outer wall forms the first portion of the fastener assembly.  (Cowart Decl., Ex. D at 147:5-12.)  Dr. Priddy identifies the second portion of the fastener assembly as the indentation in the cavity that forms a ridge and a recess.  (Cowart Decl., Ex. C at 114: 14-20.)  Nike argues that these findings and descriptions are conclusory, and that an expert's conclusory statements are alone insufficient to create a genuine factual issue.  *See TechSearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) (the conclusory statements of experts do not raise a genuine issue of material fact precluding summary judgment).

Lyons also testified that the ridge and recess create the second portion of the fastener assembly.  (Cowart Decl., Ex. D at 147:13-18.)  He points to a "separation between th[e] sole and the bottom outer sole" that creates the fastener assembly, presumably referring to the ridge and recess previously described.  (Cowart Decl., Ex. D at 152:2-12.) Nike responds that Lyons's own testimony does not qualify as expert testimony because he was neither named nor qualified as an expert witness under Federal Rule of Civil Procedure 26 and this court's order calling for expert disclosures in November 2011.

Finally, Lyons cites deposition testimony from Heard explaining that the pod tapers such that it would not fit properly if inserted backward: "If you look at the pod in general, it actually tapers from the heel as it gets towards the forefoot, so that's in direct relationship with our profile thicknesses of our midsole and how we taper from heel to forefoot in the midsole. So you wouldn't want to put the pod in backwards." (Cowrt Decl., Ex. E at 64:16-25.) Nike argues that this deposition is not relevant to the "fastener assembly" limitation because it speaks instead to the orientation of the pod relative to the cavity and that this testimony bolsters Nike's own contention that it takes minimal upward pressure to remove the pod.

In general, Nike contends that Lyons failed to address the requirement that the fastener assembly actually fasten the pod securely in the cavity, a requirement that is wholly undermined by the fact that the pods easily slide or even fall out of the cavity.

The fastener assembly has two portions and engages to fasten them securely in the cavity. The first element is met to the extent that the pod is one element of the fastener assembly, and the cavity ridge is another element of the fastener assembly. The requisite engagement, however, is not present in the accused devices. In order to meet the fastener assembly limitation, the engagement between the portions of the fastener assembly must be such that the two portions are securely fastened in the cavity. Here, the portions do not fit together such that they are securely held inside the cavity except, perhaps, when downward pressure from the foot is displacing the pod into the cavity. At all other times, the pod is not fastened in the cavity and is susceptible to removal by merely pressing the pod from the bottom of the shoe, pulling up on the flange attached to the top of the pod, or simply turning the shoe and allowing the pod to fall out. This is not indicative of a fastener assembly as described by the '448 Patent. The court agrees that Dr. Priddy's unsupported

conclusions are insufficient to create a question of fact and that the assertions of Lyons, the patentee, carry weight only to the extent that they are consistent with observable properties of the accused devices. Accordingly, Lyons has not created a genuine issue of material fact that the accused shoes meet the fastener assembly limitation and summary judgment of noninfringement on this claim limitation is granted.

### 2.    Positive Interlock

The court construed the phrase "positive interlock" as found in Claim 1 as "the relationship formed between the first and second portions of the fastener assembly, during normal wear on the foot, wherein the portions lock the cassette in the cavity such that the cassette is prevented from being displaced by the exertion of upward forces on the cassette. A positive interlock is not formed if the cassette is secured in place in the cavity by a mere press fit." (Claim Construction Order 14-15.) The claim provides, with respect to the positive interlock, that during normal use of the shoe, the cassette is secured in place by the fastener assembly which has formed a positive interlock.

Nike argues that the accused products do not meet this limitation for three reasons. First, there can be no positive interlock without a fastener assembly and the accused shoes lack a fastener assembly, as discussed above. Second, in the accused shoes, displacement of the pod is prevented by the presence of the user's foot, and not by the engagement of the fastener assembly to prevent displacement by the exertion of upward forces. Third, the only evidence Lyons provides that there is a positive interlock is the opinion of its expert, Dr. Priddy. Dr. Priddy claims that a positive interlock is created by the foot's downward pressure on the pod, causing the rubber that makes up the pod to expand into a recess under the pod. Nike argues that this theory is contrary to its expert's opinion and that Dr. Priddy failed to consider whether the downward pressure of the shoe would also

eliminate the recess, thus preventing expansion of the rubber to fill the recess.

Lyons argues that the accused devices do, in fact, employ a positive interlock to keep the pod in place in the cavity. First, Lyons cites portions of Dr. Priddy's supplemental report. He refers to Exhibits A, B, C, D, E, and I as evidence of the positive interlock. As noted above, Exhibits A though C are photographs of a cross section of AJ21. Exhibit A is a cross section of the entire shoe intended to show, generally, the various elements of the shoe. Exhibit B purports to show the cassette cavity including a ridge and recess in the cavity that, according to the picture's caption, "presses into the outer wall of the cassette material during use." (Priddy Supp. Report Ex. B.) Exhibit C shows the pod insert in the AJ21 shoe and purports to show "its contoured outside surface" and "an impression left in the outside surface of the cassette by pressure from the ridge in the cavity side wall." (Priddy Supp. Report Ex. C.) Exhibit D shows a "side view of the section AJ22 shoe with cassette in place[,]" and Exhibit E shows "the ridge and recess in the contoured side wall of the cavity of the AJ22 shoe." (Priddy Supp. Report Ex. D, E.) Finally, Exhibit I shows a cross section of the cavity of the AJ21. (Priddy Supp. Report Ex. I.) Again, Nike argues that still photographs of a cross section of the accused device cannot establish the existence of a positive interlock, and provide no evidence of what happens during use of the shoe, which is when the positive interlock is purportedly formed.

Lyons again cites to the section of Dr. Priddy's supplemental report that describes the two portions of the fastener assembly and how "[d]uring normal wear and use on a foot, the positive interlock secures the cassette in place in the sole of the shoe[,]" with something greater than a press fit. (Priddy Supp. Report at 21:13-15.) He also cites Dr. Priddy's deposition testimony. Dr. Priddy testified that the downward force of a foot during use of the shoe will compress the pod further into

the cavity and, depending on the amount of compression, the strength of the positive interlock will increase. He characterized it as a process of "compression-release" where the strength of the interlock increases upon compression, but remains interlocked in its uncompressed state as well. (Cowart Decl., Ex. C at 159:12-22.) He explains that even when the wearer is, say, jumping in the air, the pod remains in place despite the fact that the compression on the pod is relieved. (*Id.* at 161:2-10.) Dr. Priddy also states that it is "logical just from the principles of material evidence" that during use the pod heats up and expands due to this increased heat. (*Id.* at 105:12-106:1.)

Nike argues that Dr. Priddy's report and testimony are insufficient to establish a positive interlock in the accused devices. First, Dr. Priddy's only support for his opinions is, as he puts it, common sense coupled with his scientific knowledge of materials. He provides no other evidence or foundation for his opinion and did not perform any testing that would establish a positive interlock in the accused devices. As such, Nike contends, his opinion is not more than "theoretical speculation." Nike cites *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001): "In the context of summary judgment motions, the Third Circuit has demanded that the factual predicate of an expert's opinion must find some support in the record, and has emphasized that mere 'theoretical speculations' lacking a basis in the record will not create a genuine issue of fact."

Lyons also cites deposition testimony of Heard, a Nike employee, in support of the presence of a positive interlock. In his deposition, Heard tesified that the pod disperses into the recess below the ridge during use of the shoe on the foot. He stated: "So the cavity was placed in there because the outsole is raised on the bottom of that pod. So when someone is wearing it, it engages first in that raised area of the pod and there needs to be a certain amount of dispersion under load for that

pod to compress, because, again, the outsole is raised up off the ground in those certain areas."
(Cowart Decl., Ex. E at 58: 18-24.)  Upon further questioning, Heard agreed that the "cavity is there
because, under load, the pod is compressed and needs an area to disperse into[.]"  (*Id*. at 59:6-10.)
Nike responds that this testimony is taken out of context and that Heard actually testified that any
expansion would be minimal and insufficient to fasten the pod in place.

Finally, Lyons cites his own testimony that a positive interlock exists, which he explains is
premised on the existence of the fastener assembly and on tests that demonstrated, first, that the pod
stayed in place when he tested the shoe both running and jumping and, second, when he inserted the
pod into the cavity and the pod remained in place when he turned the shoe upside down.  (Cowart
Decl., Ex. D at 153:10-154:4.)  Nike revisits its argument that Lyons cannot testify as an expert
because he has not been designated an expert pursuant to the rules and this court's order.  Even so,
Nike argues, Lyons's testimony does not actually support his contention that the accused devices
employ a positive interlock and, furthermore, it reveals that the only tests Lyons performed involved
wearing the shoes and turning the shoes upside down, neither of which are sufficient to establish the
positive interlock.

Lyons has failed to present a genuine issue of material fact as to whether the downward
pressure and heat from a wearer's foot would cause the pod to expand and disperse into the cavity
recess such that a positive interlock is formed.  An "expert must set forth the factual foundation for
his opinion -- such as a statement regarding the structure found in the accused product -- in sufficient
detail for the court to determine whether that factual foundation would support a finding of
infringement under the claim construction adopted by the court, with all reasonable inferences drawn
in favor of the nonmovant."  *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042,

1047-1048 (Fed. Cir. 2000). At deposition, Dr. Priddy testified that his conclusions were based on a logical application of his general experience with materials, rather than actual testing, and that he had not observed the claimed expansion in any manner. Thus, although he describes, in general principles, how a positive interlock may be achieved in the accused device, he provides no factual foundation and his conclusions amount to speculation only. Dr. Priddy's testimony does not provide the type of detailed information necessary to overcome the evidentiary threshold at summary judgment.

Furthermore, even assuming that a positive interlock is achieved in this manner, it still would not meet all of the limitations contained in the claim. First, as the court noted, there is a temporal aspect to the positive interlock in that the positive interlock must secure the cassette in the cavity during normal use of the shoe. Although normal use of the shoe undoubtedly would include periods of time when the positive interlock would be created by pressure from the foot, there would also be periods of time where there was no pressure on the pod, no increased heat, and, thus, no positive interlock. If, however, the positive interlock is present only during a portion of the normal wear on the foot, it does not conform to the claim language. Thus, Heard's testimony does not create an issue of fact that the positive interlock claim language is met.

Finally, the court construed "positive interlock" to exclude a device wherein the cassette was secured in place by a mere press fit. Again, even assuming a positive interlock is created when the requisite pressure is placed on the pod, normal wear of the shoe would include periods of time where no positive interlock was present and where the pod was secured in the cavity by a mere press fit. Dr. Priddy testified that the positive interlock was still present even when the pod was not compressed due to the heat generated by use of the shoe and resulting expansion, although at those

OPINION AND ORDER                              14                                    {KPR}

times it would be diminished. However, as above, this conclusion is not supported by testing or any other factual basis, and the court does not find Dr. Priddy's theoretical speculation sufficient to create a genuine issue of material fact. For these reasons, there is no genuine issue of material fact that the accused devices include a positive interlock.

### 3.     Flexing to Disengage

Nike argues that, contrary to the claims and specification of the '448 Patent, the accused products do not require flexing to disengage the pod from the sole of the shoe and that this limitation undermines Lyons's case for infringement for three reasons. First, Nike argues that the shoes cannot be flexed at all. In fact, Nike's expert explained that the shoes were designed with a "shank" specifically to prevent flexion of the sole of the shoe and, even if the shoes do marginally flex, such marginal movement is insufficient to dislodge the pod. Second, Nike argues Dr. Priddy admitted that flexion was not effective to disengage the pod and, in any event, that the shoes could not reasonably be flexed. Third, Nike argues that Dr. Priddy's "heel section" theory is inapposite because this method of dislodging the pod is no different from Nike's intended method for dislodging the pod; when Dr. Priddy employed this so-called method, the pod did not disengage but simply fell out. Nike also argues that the theory itself is contrary to the claim in that the claim requires flexing the front and back ends of the shoe relative to the center of the whole shoe, while the "heel section" method calls for flexion of the back part of the shoe only, relative to the center of the heel section.

Lyons responds that Nike's reading of the claim language is overly literal and should be rejected, primarily because the claim language only requires that the cassette disengage upon flexion of the bottom sole and not flexion of the whole shoe, as Nike incorrectly states. Lyons argues further

OPINION AND ORDER                        15                              {KPR}

that the shank is an "additional structure" that should not be considered for purposes of the infringement analysis. He cites the testimony of Heard, who agrees that the sole of the shoe is distinct from the shank. (Cowart Decl., Ex. E at 15:21-24.) Nike disputes that the shank constitutes an additional structure as characterized by Lyons. Rather, Nike contends, this argument fails because the cited claim language relates to functionality or capability which imposes additional limitations on the device. As such, even if the shank is separate from the bottom sole, the shank prevents the sole from flexing as required by the claim, thus preventing the shoe from meeting the stated claim limitations.

Lyons next argues that the bottom soles of the accused devices can in fact be flexed for cassette removal as stated in Claim 1. He cites Dr. Priddy's deposition testimony, wherein Dr. Priddy states that bottom sole of both the AJ21 and AJ22 may be flexed up to a half an inch "end to end," though their flexion is limited by the presence of the shank. (Cowart Decl., Ex. C at 86:17-88:4.) Lyons also cites Dr. Priddy's supplemental report wherein Dr. Priddy indicates that "downward movement of the rear and forward ends of the heel portion of the sole by downwardly moving the forward and rear ends of the heel section of the sole with respect to its center section[]" will disengage the cassette. (Priddy Supp. Report at 22:16-21.) Nike argues that the report and testimony cited by Lyons merely demonstrate that with enough force the shoe will flex slightly, but not that flexion of the front and rear portions of the shoe acts to disengage the pod. Nike cites Dr. Priddy's testimony that the pod in the AJ22 shoe came out when the shoe was turned upside down without any flexion and that the pod in the AJ21 shoe did not come out when the shoe was flexed. (Rechtien Decl., Ex. B at 196:23-197:21.) Nike argues that this testimony undermines Lyons's contention that the accused shoes meet the flexion requirement of Claim 1.

OPINION AND ORDER                    16                    {KPR}

Lyons next argues that Nike's position regarding the issue of flexion is an attempt to avoid the court's claim construction order and to excessively narrow the meaning of the claim language. Lyons refers to the Claim Construction Order wherein the court declined to construe certain claim language for which Nike sought a particular construction. According to Lyons, Nike is again attempting to impose its narrow interpretation on the claim language which would require that the cassette remain securely engaged in the cavity until affirmatively disengaged, a position already rejected by the court. Nike responds that this argument misapprehends its rebuttal of Lyons's "heel section" theory. The "heel section" theory posits that the act of pushing the pod out of the heel is akin to flexing the shoe to disengage the cassette, a position that Nike firmly rejects. Nike also disputes Lyons's claim that the Claim Construction Order explicitly found that the cassette need not remain secured in the cavity until disengagement, arguing that the court merely declined to construe the claim language as requested by Nike on the ground that it was already sufficiently clear.

Finally, Lyons argues that the location of the point upon which the shoe is flexed is mischaracterized by Nike. Nike, he contends, argues that the flexion called for by the claim language is flexion of the front half and back half of the shoe over a central point. Lyons argues to the contrary that flexion of the shoe may be centered on the location of the cavity, and that applying pressure to that spot by pressing down on either end of the shoe will result in the cassette's removal. Thus, the method of removal contemplated by Nike, i.e., pressing up on the cassette window, was contemplated by the language of Claim 1 and is, thus, within its scope. Nike responds that this method of removing the pod is qualitatively different from the flexing requirements of Claim 1. Nike cites to the report of Simon Luthi ("Luthi"), its expert, wherein he explains that removal of the pod in this manner does not involve flexion of the shoe as described by the claim language and,

OPINION AND ORDER                    17                    {KPR}

rather, is simply the result of pushing up on the pod window from the bottom of the shoe.  (Luthi Decl., Ex. A at 45-46.)  Nike also cites Dr. Priddy's testimony that he could not flex the shoe as described in Claim 1 in a manner that would cause the pod to disengage.  (Rechtien Decl., Ex. B at 196:23-197:21.)

First, the court considers Lyons's distinction between flexing "the shoe" and flexing "the bottom sole" inapposite and the distinction irrelevant to its infringement analysis.  The claim language does not contemplate separating the bottom sole from the shoe as a whole prior to flexing it and disengaging the cassette.  Even if Nike's reference to flexing "the shoe" rather than to flexing "the bottom sole" is less specific than it might be, its analysis is not meaningfully undermined.

Second, Lyons's argument that the shank represents an additional structure that does not vitiate its claim for infringement is also unavailing.  Under direct infringement analysis, "[t]he presence of additional elements is irrelevant if all the claimed elements are present in the accused structure."  *Mannesmann Demag Corp. v. Engineered Metal Products Co., Inc.*, 793 F.2d 1279, 1282-1283 (Fed. Cir. 1986) (citing *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984)).  Even so, all limitations in claim language must be accounted for.  *See TechSearch,* 286 F.3d at 1373 ("We have further recognized that specific claim limitations cannot be ignored as insignificant or immaterial in determining infringement." (citing *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed. Cir. 1987))).

Lyons cites two cases wherein the alleged infringer claims that the accused device is distinct from the patented device because of an additional element in the accused device not described by the claims in question.  In *Mannesman*, the asserted patent covered a metal smelting furnace specially designed to "withstand the thermal and mechanical stress characteristics of electric arc

furnaces[,]" by way of a "cooling pipe coil structure." *Id.* at 1281.  The accused device included a slag-stopping bar that conferred additional benefits, and the alleged infringer argued that because this bar was not described in the asserted claims the accused device did not infringe.  The court reasoned that claim language describing the patented device as "consisting of" the following claim elements was not exclusionary such that the presence of an element other than those described avoided infringement.  It noted, as above, that so long as all claimed limitations are met, additional elements do not vitiate an otherwise valid claim for infringement.

Lyons also cites *Bernard Dalsin Manufacturing Co. v. RMR Products, Inc.*, 10 Fed. Appx. 882, 2001 WL 482374 (Fed. Cir. 2001).  In *Dalsin*, the patent covered a chimney damper that mounted to a chimney flue with certain innovations that made it more effective than a traditional damper.  The alleged infringer argued that the accused device did not infringe because, essentially, the damper in the accused device did not attach directly to the flue, but instead to an interior ledge on the accused device.  The interior ledge was deemed an intervening structure.  The court explained: "In both [of the accused] devices, the damper plate does not directly contact the top of the chimney flue when it is in its closed position.  RMR asserts that because the damper plate is not *directly* mounted to the chimney flue in either of the accused products, a finding of infringement is precluded.  However, it is well established that the presence of an additional structure, such as the intervening structure, in the accused device will not exclude a finding of infringement . . . and there is no requirement in the claim here that such additional structure be absent." *Id*. at 888 (citations omitted).

Here, by contrast, the shank is something more than an additional structure that may be disregarded in the infringement analysis.  In fact, the presence of the shank in the accused device

prevents it from functioning in the manner asserted by the '448 Patent. As such, the accused devices do not meet all limitations of the claim language in that they do not flex to disengage the pod. Were the shank an intervening structure, all claim limitations would nonetheless be met.

Finally, there is no evidence in the record that supports Lyons's contention that the pod is disengaged by flexing the bottom sole of the accused devices. As a practical matter, the evidence, including that of Lyons's own expert, demonstrates that the pod is removable by pushing it out from the bottom sole of the shoe, lifting the pod out by the integral flange, or even by merely turning the shoe over and allowing the pod to fall out. Lyons seems to argue that if the user is attempting to flex the shoe and places his or her fingers on the pod window, the user will "disengage" the pod. Although this scenario is plausible, it does not demonstrate that the accused devices infringe. The pod does not require that the shoe be flexed in order to remove the pod. In fact, the shoe is not capable of being flexed more than a minimal amount and the flexing of the shoe plays no meaningful role in removing the pods, which are removable by either simple pressure or the operation of gravitational forces. Accordingly, there is no genuine issue of material fact that the accused devices meet the "flexing to disengage" limitation of Claim 1.

###     4.    Removable Insole

Claim 1 states, with respect to the insole, that the shoe has "an insole removably mountable in the interior of said shoe[,]" and that the cassette maybe be "remov[ed] from said cavity by removal of said inner sole[.]" (Patent 6:38-39.) Although this language was not construed, Nike argues that it is evident that the claim contemplates a completely removable insole and that this limitation is not found in the accused products. Rather, Nike explains, the insoles of the accused products are partially attached to the shoes and cannot be completely removed. According to Nike, Dr. Priddy

testified that the insoles in the accused products could be completely removed, but only if they were ripped out, a use that does not reasonably comport with the claim limitations.

Lyons responds that a finder of fact must decide whether the claim language was intended to limit the patent to a shoe with an insole that allows complete removal of the insole, or if it merely calls for an insole that is removable to the extent necessary to permit insertion and removal of the cassette. Lyons refers first to photographs attached to Dr. Priddy's supplemental report. Exhibit G is a picture of the interior of the AJ21 shoe showing the insole pulled back to reveal the pod inserted in the cavity. Exhibit L shows the interior of the AJ22, again with the insole pulled back to reveal the pod inserted in the cavity. In his supplemental report, Dr. Priddy states that a "removably mountable" insole is present in both of the accused devices. (Priddy Supp. Report at 10:16-11:2; 18:8-12.) In his deposition testimony, Dr. Priddy claims that he was able to "pick up" the insole in the AJ21 shoe. (Cowart Decl., Ex. C at 88:9-12.) Lyons also cites the testimony of D'Wayne Edwards, one of the shoe designers, that the insoles of the AJ21 and AJ22 shoes are, in fact, "removable by the consumer[.]" (Cowart Decl., Ex. F at 60:2-11.) On this evidence, Lyons contends that an issue of fact lies as to whether partial removal is sufficient to satisfy the claims of the '448 Patent.

Nike responds that the dispute over the meaning of "removably mountable" is a question of law, essentially an issue of claim construction, and is thus amenable to summary judgment. According to Nike, it is undisputed that the insoles of the accused shoes are partially bonded to the bottom soles and not wholly removable, and the court need only determine whether the claim language requires complete or partial removal of the insole. Nike argues that a literal reading of the claim language supports its theory, whereas Lyons argues that such an interpretation divorces the

claim language from the specification as a whole.  Nike argues that the evidence cited by Lyons is inapposite.  With respect to Edwards's testimony, Nike contends that it was taken out of context as it did not contemplate the limitations described by the claim language.  The testimony is also less than credible, Nike explains, because counsel did not provide Edwards with an example of the shoe at deposition, which deposition was taken approximately four years after Edwards was involved in designing the shoe in question.  Furthermore, a simple examination of the accused shoes demonstrates that the insoles are not wholly removable and are instead bonded to the bottom sole of the AJ21 and AJ22.  As such, Nike urges the court to determine as a matter of law that the accused shoes do not meet the "removably mountable" limitation of the claim language.

As Nike argues, the proper construction of the asserted claims is a matter of law determined by the court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996).  The claim refers unambiguously to the insole as "removably mountable in the interior of said shoe."  ('448 Patent at 6:20.)  The photographs submitted by Lyons merely confirm that the insole is bonded to the bottom sole, and thus not wholly removable.  Furthermore, Dr. Priddy's testimony that the insole is "removably mountable" is conclusory and does not otherwise establish that the shoe meets the claim language.  Finally, to the extent that Edwards testified that the insoles were removable, this testimony is contrary to the evidence in the record and does not weigh against the conclusion that the insoles are not, in fact, removable.  For these reasons, the claim limitation requiring completely removable insoles is absent from the accused devices and summary judgment is granted in Nike's favor on this issue.

Accordingly, for the reasons stated, Claim 1 is not infringed as a matter of law.

B.      *Non-infringement of Claim 3*

Claim 3 states:

A shoe as defined in claim 1 further characterized by; said cassette having a bottom section and a top section with at least one spring element interposed therebetween; said bottom section and top section secured together to lock said at least one spring element in position therebetween.

(Patent 6:54-61.)

Nike argues that the accused products do not infringe this claim for three reasons. First, Nike argues that because Claim 3 is dependent on Claim 1, and because Claim 1 is not infringed, it follows that Claim 3 is not infringed. Second, Nike argues that the pod is not comprised of a bottom and a top section secured together, but is instead comprised of a continuous piece of foam with a rubber coating. Third, even if the pod were determined to have a top and bottom portion, Nike argues that it would not meet the limitation of Claim 3 that calls for two portions locking a spring element in position, again noting that the interior of the pod is a continuous piece of foam. Nike contends that Dr. Priddy's analysis represents a "tortured reading" of the claim and is inapposite.

Lyons responds that the reports and testimony of Dr. Priddy establish genuine issues of material fact regarding whether the accused devices infringe Claim 3. First, he cites to portions of the supplemental report stating that the pod has all of the elements of the cassette described by Claim 3. In particular, with respect to both shoes, Dr. Priddy describes the outer covering of the pod as having a distinct top and bottom, housing a "pillow" inside that is the equivalent of the spring element in Claim 3. (Priddy Supp. Report at 16:15-20; 23:12-17.) In Dr. Priddy's deposition, he testified that an "air pocket" in between a top and a bottom qualifies as a spring element housed between top and bottom sections. (Cowart Decl., Ex. B at 208:10-16.) Nike responds that Lyons did not meaningfully challenge its arguments that the pod lacks a number of characteristics of the

cassette described in Claim 3. Nike also argues that the citations to Dr. Priddy's report and testimony do not address express limitations in Claim 3, namely that the top and bottom sections are "secured together" and to "lock" the pod inside.

As Nike argues, Claim 3 is dependent on Claim 1. *See* Patent '448 at 6:54-59. The law is clear that where an independent claim is not infringed, a dependent claim also is not infringed. *See Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989) ("One may infringe an independent claim and not infringe a claim dependent on that claim. The reverse is not true. One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim."). Here, the court has ruled that Claim 1 is not infringed as a matter of law and, accordingly, summary judgment of noninfringement of Claim 3 is granted.

In light of the fact that, as a matter of law, Nike has not infringed the '448 Patent, the court need not address Lyons's motion for partial summary judgment of willful infringement and denies it as moot.

II.    Invalidity

Nike also moves for summary judgment that the '448 Patent is invalid as anticipated and obvious. "In asserting an invalidity defense, an alleged infringer must contend with the first paragraph of § 282, which provides that '[a] patent shall be presumed valid' and '[t]he burden of establishing invalidity . . . rest[s] on the party asserting such invalidity.' Under the Federal Circuit's reading of § 282, a defendant seeking to overcome this presumption must persuade the factfinder of its invalidity defense by clear and convincing evidence." *Microsoft Corp. v. i4i Ltd. Partnership*, __ U.S. __, 131 S. Ct. 2238, 2243 (2011). Furthermore, "'[w]hile the ultimate question of patent validity is one of law,' the same factual questions underlying the PTO's original examination of a

patent application will also bear on an invalidity defense in an infringement action." *Id.* at 2242-2243 (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)). Nike asserts the '448 Patent is anticipated by U.S. Patent No. 1,114,685, which the court will hereinafter refer to as "the Freeman Patent" and that it was obvious in light of the combination of the Freeman Patent and European Patent Publication No. 0111084 A1, hereinafter referred to as "the Bente Patent."

### A.    Anticipation

Anticipation and obviousness are interrelated concepts, as each looks to whether earlier innovations should have precluded issuance of a patent as not sufficiently innovative to merit protection. Anticipation, however, presents a more stringent burden on the party seeking to invalidate the patent, because it provides that a single "prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently, to anticipate." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001) (citing *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997)). A claim limitation that is not expressed explicitly in the prior art reference may still speak to anticipation where "the prior art necessarily functions in accordance with, or includes, the claimed limitations[.]" *Id.* at 1327-28 (citing *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999)). Anticipation is a question of fact. *In re Hyatt*, 211 F.3d 1367, 1371 (Fed. Cir. 2000).

According to Nike, the Freeman Patent was not before the PTO at prosecution of the '448 Patent, which undermines the weight given the PTO's determination of liability. *See Atlas Powder Co. v. E. I. du Pont de Nemours & Co.*, 750 F.2d 1569, 1573 (Fed. Cir. 1984) ("Though the introduction of prior art not before the PTO may facilitate meeting the challenger's ability to meet the burden of proof on invalidity, the presumption remains intact, the burden of persuasion remains

on the challenger, and the 'clear and convincing' standard does not change.").

Nike argues that Claims 1 and 3 are anticipated by the Freeman Patent.

1.    Claim 1

Nike recites the elements of the Freeman Patent, and compares them to Claim 1 of the '448 Patent, noting that paragraphs 2 through 9, or [2]-[9],[3] of the '448 Patent are clearly disclosed by the Freeman Patent. Nike points out that Lyons's expert[4] did not dispute this and the court's review of the portion of the expert report regarding the Freeman Patent does indeed focus on the preamble, [1], and [10]. *See generally* Rechtien Decl., Ex. I. As such, Nike provides more detailed analysis as to the disputed sections.

The preamble to Claim 1 states: "An athletic shoe characterized by[.]" (Patent 6:14.) According to Nike, this language does not limit the claim because it merely states the purpose or intended use of the shoe, and the body of the claim fully describes the structure of the invention. Whether a preamble is treated as a claim limitation is determined in light of the entire patent and the inventor's intent. *Catalina Marketing International, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citing *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251,

---

[3] Nike refers to the claim paragraphs by bracketing the paragraph numbers. The court adopts this approach for ease of reference.

[4] Nike also argues that Lyons's invalidity expert, Mark J. Patterson, admitted that he was not a person skilled in the art and, thus, his opinions bear no weight. *See Sundance, Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008) ("Nor may a witness not qualified in the pertinent art testify as an expert on obviousness, or any of the underlying technical questions, such as the nature of the claimed invention, the scope and content of prior art, the differences between the claimed invention and the prior art, or the motivation of one of ordinary skill in the art to combine these references to achieve the claimed invention."). Patterson does in fact testify that he does not consider himself skilled in the art of footwear. (Rechtien Decl. Ex. J 75:23-76:10.) As such, his testimony regarding the invalidity of the '448 Patent is given no weight.

1257 (Fed. Cir. 1989)).  "In general, a preamble limits the invention if it recites essential structure

or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."  *Id.* (citing *Pitney*

*Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).  Preamble language that

merely states a "purpose or intended use" and does not implicate the structure of the device is not

considered a claim limitation.  *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997).  Nike notes that

the body of the claim refers not to "the athletic shoe," but merely to "the shoe."  Nike points out that

the Freeman Patent states that its design can be used for any type of shoe, and that athletic shoes

were in existence at the time the Freeman patent issued in 1914.  *See generally* Rechtien Decl. Ex.

K.  Nike presents evidence that athletic shoes were in use in 1914, citing a patent for rubberized

shoes and articles about the existence of athletic events and shoes in the early twentieth century.

Lyons responds that the term "athletic" should be considered a limitation because it relates to the

cushioned sole and gives meaning to the claim as a whole.  Nike replies that the term "athletic" is

not necessary to disclose the structure of the shoe, but merely expresses Lyons's purpose or intended

use for his device.  Nike also points to the prosecution history, noting that "athletic" was never relied

on to limit the claim language or distinguish it from prior art.

　　　With respect to [1], Nike argues that Freeman states that its design is appropriate for all types

of shoes and reveals that, in 1914, shoes could include cushioning material like cushioning rubber.

*See id*.  According to Nike, additional other references disclose that cushioning soles were in use at

that time and that there is no dispute that "bottom cushioned sole" is part of Claim 1.  Therefore,

Nike argues, as Freeman is applicable to any shoe and cushioned soles were available at the time,

the claimed innovation of the '448 Patent was obvious.

　　　Finally, regarding [10], Nike argues that, like the '448 Patent, the Freeman Patent includes

both a removable insole and a removable cassette.  Nike also argues that the Freeman Patent teaches downward flexing to remove the cassette both by suggesting the use of cushioning material and by stating that the patented device could be used in any shoe.  Taken together, Nike contends, the Freeman Patent teaches that a cassette can be used in shoes with bottom cushioned soles, noting also that there is nothing in the Freeman Patent that would otherwise impede flexion.  On these bases, Nike argues that a person of ordinary skill in the art would be able to combine the Freeman Patent and a shoe with a flexible bottom sole to come up with the '448 Patent.  Nike points out that the '448 patent is not limited to certain types of soles and that, at prosecution, Lyons did not distinguish the device from inflexible soles, but instead added the "positive interlock" language to narrow the claim. Accordingly, Nike concludes, Freeman discloses a device capable of meeting the limitations of Claim 1 and summary judgment on anticipation is appropriate.

Lyons responds that the Freeman Patent does not reference an athletic shoe or a shoe with a bottom cushioned sole, and that Nike fails to identify a shoe so referenced with the stated characteristics.  Thus, Lyons argues, the Freeman Patent does not anticipate the subject matter of Claim 1.  Lyons also argues that the Freeman Patent merely discloses a single embodiment of a pneumatic sole in a wooden boot which is inconsistent with athletic shoes and those with cushioned bottom soles and, therefore, its disclosure would have been unwarranted at prosecution.  Lyons refers to Luthi's report which describes the illustrated embodiment of the Freeman Patent as a boot with a wooden heel.  Luthi writes:  "In the 'boot heel' example described in Freeman, the wood structure of the boot heel area would prevent the type of flexing required by claim 1 to disengage the first and second portions of the fastener assembly to allow removal."  (Luthi Decl., Ex. B at 30.)

The court does not find as a matter of law that the Freeman Patent anticipates Claim 1.  To

anticipate the '448 Patent, the Freeman Patent must disclose all limitations of Claim 1, though it may do so both explicitly and implicitly. The court agrees with Nike that the term "athletic" in the preamble is not a limitation on Claim 1, as it speaks to the purpose or intended use and not to the actual structure of the shoe. Assuming, as Nike contends and Lyons does not dispute, that Freeman anticipates [2] through [9], there are at least genuine issues of material fact as to whether it anticipates [1] and [10]. The court is not persuaded that in referring to the general use of cushioning material in conjunction with the existence of athletic shoes, at the time the Freeman Patent issued, anticipates "a bottom cushioned insole" as a matter of law. Similarly, the court does not agree with Nike that Freeman's reference to cushioning material and its potential use in "any shoe" suffices, as a matter of law, to teach the content of [10] which describes flexing the sole downward to disengage the fastener assembly and facilitate removal of the cassette. Accordingly, Nike's motion for summary judgment on anticipation of Claim 1 is denied.

### 2.    Claim 3

Nike argues that, under Lyons's own construction of Claim 3, the removable pod in the Freeman Patent anticipates the '448 Patent. In particular, Nike argues that the pods, per Lyons, have a top area, a bottom area, the areas are sealed, and the air pocket qualifies as the spring element. Nike cites Dr. Priddy's report for its conclusion that the top and bottom areas are secured together to lock the spring element in place.

Lyons responds by citing the court's discussion of "cassette" in its Claim Construction Order: "the cassette as described in the patent is more than an outer covering or housing; it includes the material that is inside the housing, namely the springs and the spring seats." (Claim Construction Order at 7.) Lyons argues that the Freeman Patent does not disclose a cassette, but merely a rubber

insert that is filled with air.  He argues that this is starkly different from the cassette described in the

'448 Patent and therefore does render the '448 Patent anticipated or obvious.  Thus, Lyons contends,

Nike has not met its prima facie burden and the '448 Patent cannot be invalidated as anticipated.

Nike points out that Lyons's current characterization is at odds with his prior characterization

of the cassette given in the context of the infringement analysis.  Nike argues that the claim langauge

must be given the same "scope and meaning as it was given in the infringement context."  (Nike's

Memorandum at 34 (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1352

(Fed. Cir. 2001)).  The court decided infringement of Claim 3 on other grounds and did not consider

the scope and meaning of Claim 3 beyond its earlier analysis at claim construction.  As such, the

court must now consider the scope and meaning of Claim 3.

In his discussion of infringement, Lyons argued that the removable pod was comprised of two

parts forming the top and bottom of the cassette and encasing, between them, the foam cushion

which comprised the spring element.  Under this interpretation, as Nike argues, the cassette in the

'448 Patent reads on the cassette described in the Freeman Patent.  However, the court does not agree

that the pod described by the Freeman Patent reads on the cassette described in the '448 Patent.

Rather, the court refers back to the claim language and its own discussion of the cassette at claim

construction.  Claim 3 states:  "A shoe as defined in claim 1 further characterized by; said cassette

having a bottom section and a top section with at least one spring element interposed therebetween;

said bottom section and top section secured together to lock said at least one spring element in

position therebetween[.]"  (Patent at 6:55-61.)  The court did not separately construe "cassette" but

noted that it was comprised of more than the outer housing, and must contain springs and spring

seats inside the housing.  (Claim Construction Order 7.)  In the Freeman Patent, the insert has neither

OPINION AND ORDER                    30                         {KPR}

a top nor a bottom but has one continuous outer housing, and has nothing inside the housing other than air.  This is not the same as the cassette described by the '448 Patent and for this reason, the Freeman Patent does not anticipate the '448 Patent with respect to this claim language.  Nike's motion for summary judgment on anticipation of Claim 3 is denied.

3.    Enablement

The Patent and Trademark Act provides that a patent specification must set forth "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112.  Thus, in order for a prior patent to function as prior invalidating art to a subsequent patent, it must be "enabled" – a term of art in patent law that refers to the sufficiency of the specification.  "Enablement requires that 'the prior art reference must teach one of ordinary skill in the art to make or carry out the claimed invention without undue experimentation.'" *Elan Pharmaceuticals, Inc. v. Mayo Foundation for Medical Education and Research*, 346 F.3d 1051, 1054 (Fed. Cir. 2003) (quoting *Minnesota Mining and Manufacturing Co. v. Chemque, Inc.*, 303 F.2d 1294, 1301 (Fed. Cir. 1999)).  "Invalidity for lack of enablement is a conclusion of law and must be supported by facts proved by clear and convincing evidence, for the grant of the patent by the PTO carries with it the presumption of validity including compliance with § 112." *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 941 (Fed. Cir. 1990).

Nike argues that the Freeman Patent is presumed enabled and that Lyons's invalidity expert, Patterson, failed to affirmatively establish by clear and convincing evidence that it is not enabled. Lyons responds, essentially, that the Freeman Patent does not anticipate the '448 Patent and so

enablement is irrelevant.  In light of the presumption of validity, and Lyons's failure to present clear and convincing evidence that it is not enabled, the court finds the Freeman Patent enabled as a matter of law.

       B.     *Obviousness*

The Supreme Court addressed the question of obviousness in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966).  It articulated a framework to interpret the statutory language regarding obviousness:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Id.* at 17-18.  The court later expanded on this framework in *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007).  It explained obviousness as such:  "When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.  For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."  *Id.* at 417.

"For over a half century, the Court has held that a 'patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men.'"  *KSR*,

550 U.S. at 415-416 (quoting *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*,

340 U.S. 147, 152-153 (1950)).  This is the underlying rationale for the doctrine of obviousness,

codified in the PTA:

> A patent may not be obtained though the invention is not identically disclosed or
> described as set forth in section 102 of this title, if the differences between the subject
> matter sought to be patented and the prior art are such that the subject matter as a
> whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains.  Patentability
> shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103(a) (2009).  Obviousness is evaluated as a matter of law, though it is "based on

several factual inquiries:  (1) the scope and content of the prior art; (2) the differences between the

prior art and the claims at issue; (3) the level of ordinary skill in the art at the time when the

invention was made; and (4) objective evidence of nonobviousness." *Specialty Composites v. Cabot*

*Corp.*, 845 F.2d 981, 989 (Fed. Cir. 1988) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18

(1966)).

The Bente Patent generally describes a "[s]ports shoe with a shock absorbing heel."

(Rechtien Decl., Ex. Q at 1607.)  The shoe "has an insert made of elastically resilient material for

shock absorbing support of the heel, which insert is arranged in the heel region of the sole body in

a recess of the sole body." *Id.*  The insert is secured in the cavity through either a snug fit in the

recess or the inclusion of an additional structure into which a protrusion from the insert fits, securing

the insert in the cavity.  (Rechtien Decl., Ex. Q at 1611, 1613.)

## 1.    Person of Ordinary Skill in the Art

Nike asserts that, per Luthi, a person of ordinary skill in the art would have two to four years

of experience in designing and developing athletic footwear, and that this was not disputed by

Lyons's expert.  *See* Luthi Decl., Ex. B at 20 ("In my opinion, a person of ordinary skill in this art at the relevant time period would have around 2-4 years of practical work experience in the design and development of footwear.").  Lyons does not dispute this characterization and the court accepts it as true for present purposes.

2.    Secondary Considerations

Nike notes that Lyons's expert did not identify any "secondary considerations" with respect to obviousness, citing Patterson's expert testimony which states same.  (Rechtien Decl. Ex. J at 228:2-7.)  Nike also refers to Lyons's response to its interrogatory regarding secondary considerations, in which Lyons explained that there was a longstanding unmet need for such innovations, tending to show that the solution was not obvious.  (Rechtien Decl., Ex. P at 5.)  Lyons also cited the enthusiasm with which Nike introduced the allegedly infringing shoes and the ease with which the '448 Patent progressed through the patenting process.  *Id.*

Nike first argues that the passage of time is insufficient to render an invention not obvious.  In *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006), the Federal Circuit referred to "secondary indicia of non-obviousness like 'commercial success, long felt but unresolved needs, failure of others, etc.'" (citing *Graham*, 383 U.S. at 17-18.).  The court, responding to a request that it take judicial notice of the "long-felt but unresolved need" for the device, noted that it did not qualify as the type of information appropriate for judicial notice, and that the request also failed because the patentee failed to submit actual evidence of such need.  The court explained:  "This is because '[a]bsent a showing of long-felt need or the failure of others, the mere passage of time without the claimed invention is not evidence of nonobviousness.'"  *Id.* at 990-991 (quoting *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004)).

Nike next argues that the ease with which the patent moved through the patenting process does not weigh in favor of Lyons because, in fact, the asserted claims were twice rejected by the PTO. Nike cites the prosecution history of the '448 Patent. (Rechtien Decl., Ex. C at 1817-1821, 1958-1964.) Lyons does not dispute this and the record supports Nike's contention.

Lyons does not seriously challenge Nike's arguments regarding secondary considerations and focuses, instead, on the scope and content of the prior art in comparison with the claims currently at issue.

### 3.    Scope and Content of Prior Art and Claims Currently at Issue

Nike argues that two patents, the aforementioned Freeman Patent and Bente Patent, combine to make the '448 Patent an obvious combination of preexisting elements of prior art. Nike notes that the Bente Patent was published in 1984 and, therefore, qualifies as prior art to the '448 Patent. Nike argues that it discloses the majority of the elements of the limitations in Claim 1 including "a bottom cushioned sole; an upper; a removable insole; a recess/cavity in the bottom cushioned sole; and a flexible removable insert which can be mounted in the cavity." (Nike Memorandum (#105) at 39.) Nike argues that these, in conjunction with the fastener assembly and positive interlock disclosed by the Freeman Patent, render the '448 Patent obvious. According to Nike, both patents teach that the design should provide that the insert should be retained in the cavity. As such, Nike contends, substitution of the engagement of the fastener assembly in the Freeman Patent for the insertion element in the Bente Patent would obtain the predictable result described by the '448 Patent. In Nike's words, "[s]uch an arrangement would form the required fastener assembly and positive interlock" of the '448 Patent and would also satisfy the limitation of "flexing to disengage." (Nike Memo. at 42.)

OPINION AND ORDER                    35                    {KPR}

Nike next argues that Claim 1 is obvious because it is a combination of known elements that are combined in an obvious manner. Again, Nike argues that the Bente Patent contains all limitations of Claim 1 except for the fastener assembly, but that "the Freeman cassette/cavity arrangement is the same fastener assembly and works in the same way as the one claimed in the '448 Patent . . ." *Id.* Claim 1 is also obvious, argues Nike, because the method of contouring to fasten described by the Freeman Patent was an obvious improvement to a similar device, the Bente Patent. Finally, Nike argues that under the "teaching, suggestion or motivation" test, the Bente Patent discloses that it is desirable to design a cavity that retains its cassette in a manner that employs "corresponding structures," as does the Freeman Patent. Nike contends, without further explanation, that this teaching would also satisfy the "flexing to disengage" limitation of the '448 Patent for the same reasons articulated in the anticipation section. As such, Nike argues that obviousness is apparent and summary judgment is appropriate.

Lyons responds, first, that the Bente Patent actually teaches away from a fastener assembly and positive interlock as the connection between the insert and the shoe involves neither. Lyons next argues that Nike has not established that Freeman discloses an insert that is removed by flexing or that the Freeman Patent enables the practice of such function. And, generally, Lyons argues that the Freeman and Bente Patents cannot be combined because Freeman discloses a shoe with a wooden heel and Bente discloses an athletic shoe with a cushioned sole.

The court agrees with Lyons that Freeman and Bente do not render the '448 Patent obvious and denies Nike's motion for summary judgment on this issue. A patent, presumed valid, may only be invalidated for clear and convincing reasons. *Enzo Biochem, Inc. v. Gen-Probe Incorporated*, 424 F.3d 1276, 1281 (Fed. Cir. 2005). Nike argues that Lyons's evidentiary proffer was insufficient to

survive summary judgment of obviousness and cites a number of cases for the proposition that a patentee may not rely on conclusory assertions of an expert or attorney argument. Notably, however, this burden falls on the patentee only where the party alleging invalidity has met its prima facie burden. *See id*. at 1284 ("Although, as Enzo correctly stated at oral argument, a nonmoving party can defeat a motion for summary judgment by explaining why a party (Gen-Probe) with the burden of proof cannot meet its summary judgment standard, Enzo is mistaken that Gen-Probe has not met that hurdle.") Here, in contrast to *Enzo*, the court finds that Nike has not met its burden to establish, clearly and convincingly, that the '448 Patent is invalid as obvious.[5] Although Lyons may not have made the evidentiary showing necessary to defeat a prima facie case of obviousness, the issue has not proceeded to that stage, as Nike has failed to meet its prima facie burden.

The court is not persuaded that the element of Claim 1 calling for flexion to disengage the cassette is obvious in light of the Freeman and Bente patents. Nike's contention, underlying each of its theories of obviousness, that the "flexing to disengage" limitation is met through combination of the two patents is not well taken. Nike argues that placing an insert like that found in the Freeman Patent in a shoe with the characteristics of the Bente Patent would satisfy the "flexing to disengage" limitation in the '448 Patent. However, the insert described in the Freeman Patent is not removed by flexion, nor is such a method of removal suggested by the patent. Nike's argument that the fact that the Freeman technology is applicable to any shoe or boot means that it could be used in a shoe with a flexible sole is insufficient to suggest that its removal be achieved through flexing the sole to disengage. The insert described by the Bente Patent is not removed by flexing the bottom sole

---

[5] Also cited by Nike, *Odom v. Microsoft Corp.*, 429 Fed. Appx. 967 (Fed. Cir. 2011), *unpublished*, stands for the basic proposition that a failure to rebut a prima facie case of obviousness calls for a ruling that a patent is invalid as obvious.

OPINION AND ORDER                37                {KPR}

of the shoe.  Nonetheless, Nike argues that "flexing to disengage" is disclosed by the combination of the two:

> Finally, Freeman discloses to a person of skill in the art the required flexing downwardly to disengage.  Indeed although the wood structure of the "boot heel" example described in Freeman would prevent the type of flexing required by claim 1, Freeman's disclosure is not limited to that specific "boot heel" example.  As established above, Freeman discloses the existence of cushioning material for shoe soles (*e.g.*, ordinary rubber) and that the invention can be used by "all boot and shoe-wearers" and "can be fitted to any boot or shoe."  Thus, Freeman expressly teaches that his invention can be used in shoes having bottom cushioned soles like the bottom cushioned soles referenced in the '448 Patent.  Moreover, like the '448 Patent, Freeman does not identify any structure that would prevent a shoe having a bottom cushioned sole from being flexed downwardly to allow disengagement of the first and second portions of a fastener assembly.

(Nike Memo. 32 (internal citations omitted)).  In this passage, Nike cites to its expert Luthi, who concluded that because the Freeman patent was not limited to shoes that could not be flexed, it actually teaches to a person of ordinary skill "that the removable cassette could be used in a shoe that can be flexed such that its rear and forward ends move downwardly with respect to its center section to disengage the first portion from the second portion of said fastener assembly and allow removal of the cassette/insert *a* from the cavity and from the interior of the shoe."  (Luthi Decl., Ex. B at 30.)  As with Nike's argument on this point with respect to anticipation, the court does not consider this a clear or convincing basis sufficient to undermine the '448 Patent's presumed validity as a matter of law.  Nike does not explain how the inclusion of a flexible sole on the shoe described by the Freeman Patent would obviously suggest that the cassette or insert be removed by flexing the shoe.  There is no indication that the insert in Freeman is designed for such a method of removal.  Nike makes much of the fact that the Freeman Patent is directed at any shoe or boot, but does not explain how its use in a shoe with the ability to flex would render it removable by flexion.  Neither the

Freeman nor Bente Patents even contemplate removal by flexing the bottom sole, and their combination does not render it obvious.  As such, Nike's motion for summary judgment as to obviousness is denied.

*Conclusion*

For the reasons stated, Nike's motion for summary judgment (#103) is GRANTED as to noninfringement and DENIED as to invalidity.  Lyons's motion for partial summary judgment (#102) is DENIED as moot.

DATED this 7th day of June, 2012.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge